LORI ASPINALL & another[1] *vs.* PHILIP MORRIS COMPANIES,
INC.,[2] & another.[3]

Suffolk. April 5, 2004. - August 13, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Tobacco. Advertising. Consumer Protection Act,* Unfair or deceptive act, Class
    action. *Practice, Civil,* Class action, Interlocutory appeal. *Appeals Court,*
    Appeal from order of single justice.

This court did not reach the question whether a single justice of the Appeals
    Court had authority to rule on the merits of an order in a civil action
    certifying a class, where the single justice, after decertifying the class,
    granted the plaintiffs leave to appeal from her decision to a panel, and
    therefore, the question of the class certification was properly before this
    court [389]; moreover, this court did not reach the question whether the
    order of the motion judge or the order of the single justice was to be
    reviewed, because analysis of whether the single justice abused her discre-
    tion required examination of the foundational order of the trial court and
    the merits of the case for certification presented to the motion judge
    [389-391].
In a civil action alleging that the defendants' marketing of certain "light"
    cigarettes as delivering "lowered tar and nicotine" constituted deceptive
    conduct in a trade or business, in violation of G. L. c. 93A, §§ 2 and 9, the
    judge's certification of a class consisting of purchasers of the cigarettes in
    Massachusetts during the four years preceding the filing of the complaint
    was amply supported by the record, where the claims of the plaintiffs and
    members of the purported class derived from a common course of conduct
    on the part of the defendants and presented the identical issue (whether the
    defendants misrepresented material information concerning the design,
    function, marketing, toxicity, and tar and nicotine yields of the cigarettes);
    where the plaintiffs were similarly situated to other consumers of the
    cigarettes and had been similarly injured; where, if there were to be
    individual trials, common aspects of the defendants' conduct would
    predominate each trial; and where considerations of delay, high costs, and
    arbitrary results also provided support for the appropriateness of certifica-
    tion [391-393]; this court rejected the proposition that the purchase of an
    intentionally falsely represented product could not, by itself, be an ascer-
    tainable injury under the consumer protection statute [393-398], and noted
    that the damages sought by the plaintiffs, if they were able to prove them,

---

[1]Thomas Geanacopoulos.
[2]Now incorporated as Altria Group, Inc.
[3]Philip Morris, Inc., now incorporated as Philip Morris USA Inc.

constituted a variation on the "benefit of the bargain" rule that awards a defrauded party the monetary difference between the actual value of a product at the time of purchase and what its value would have been if the representations made about the product had been true, but that in the event that the plaintiffs were unsuccessful in their attempt to prove actual damages, they would still be entitled to recover statutory damages under G. L. c. 93A, § 9 (3) [398-402]. Cordy, J., with whom Ireland and Cowin, JJ., joined, dissenting.

CIVIL ACTION commenced in the Superior Court Department on November 25, 1998.

A motion for class certification was heard by *Robert J. Kane,* J.

A proceeding for interlocutory review was heard in the Appeals Court by *Janis M. Berry,* J. The Supreme Judicial Court granted an application for direct appellate review.

*Thomas V. Urmy, Jr. (Todd S. Heyman* with him) for the plaintiffs.

*Kenneth J. Parsigian (Paul E. Nemser & Michael J. Tuteur* with him) for the defendants.

*Evan Slavitt,* for Washington Legal Foundation, amicus curiae, submitted a brief.

GREANEY, J. The essential question presented by this appeal is whether the marketing of Marlboro Lights as "light" cigarettes that deliver "lowered tar and nicotine" may be challenged in a class action seeking damages, as deceptive conduct in a trade or business, in violation of G. L. c. 93A, §§ 2 and 9. The individual plaintiffs, smokers of Marlboro Lights, allege in their second amended complaint that Philip Morris Companies, Inc., and its subsidiary, Philip Morris, Inc., have engaged in practices prohibited by our consumer protection statute by misleading the public into believing that their product, Marlboro Lights, would deliver lower levels of tar and nicotine, when the defendant companies knew the truth to be otherwise and, in fact, intentionally designed the product so that most smokers of Marlboro Lights would receive as much, or more, tar and nicotine than if they had smoked regular cigarettes. The allegations, set forth

below, are quite specific.[4] The plaintiffs seek, on behalf of themselves and all other purchasers of Marlboro Lights in Mas-

---

[4]The plaintiffs' second amended complaint asserts that ·the defendants violated G. L. c. 93A, §§ 2 (a) and 9, by engaging in the following conduct:

"(a) By incorrectly advertising and making false claims that their light cigarettes, when smoked under normal use, contained lower tar and nicotine than regular cigarettes;

"(b) By failing to disclose that the design and composition of Marlboro Lights are intended to deliver lowered tar and nicotine levels under machine testing conditions and to deliver higher tar and nicotine levels to consumers who smoke Marlboro Lights;

"(c) By placing vent holes on the filter of light cigarettes in a location where they are covered or blocked by the smoker's lips and/or fingers under normal use, thereby negating the claim of lowered tar and nicotine;

"(d) By failing to mark the vent holes or to make them visible to the naked eye, or otherwise to disclose their existence and location, so that smokers could attempt to smoke the cigarettes in a manner that would allow them to obtain the claimed reductions in tar and nicotine, notwithstanding the fact that the [d]efendants are aware that the claimed 'lowered tar and nicotine' cannot be achieved if the holes are covered;

"(e) By failing to disclose to consumers that smoking [the d]efendants' cigarettes with the vent holes blocked results in the smoker receiving an increased amount of tar and nicotine that may be as much as, or more than, the amounts of those substances the smoker would receive from a 'regular' cigarette;

"(f) By failing to instruct smokers, on the packaging or elsewhere, on how to smoke the cigarettes correctly in order to obtain the claimed 'lowered tar and nicotine,' including avoidance of (i) blocking the vent holes and (ii) increased puff volume and frequency;

"(g) By failing to disclose to consumers that the techniques [the d]efendants employ purportedly to reduce the levels of tar in Marlboro Lights actually increase the mutagenicity of the smoke produced by those cigarettes;

"(h) By manipulating the nicotine levels in their light cigarettes; and

"(i) By failing to inform consumers of the [d]efendants' manipulation of the nicotine levels in Marlboro Lights by the addition of chemicals, among other things, or the effects of such manipulation or [the d]efendants' reasons for such manipulation."

sachusetts, actual damages or, in the alternative, statutory damages under G. L. c. 93A.[5] The plaintiffs also allege that the defendants' "willful and knowing" conduct and bad faith refusal to respond to the plaintiffs' demand for relief entitles them to a statutory award of multiple damages.

The plaintiffs filed a class certification motion pursuant to G. L. c. 93A, § 9 (2), that portion of our consumer protection statute allowing persons who have been injured by an unfair or deceptive act or practice to pursue a class action "if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons."[6] After a hearing, a judge in the Superior Court certified a class consisting of purchasers of Marlboro Lights in Massachusetts during the four

---

[5]The plaintiffs' second amended complaint, which is the basis for this appeal, also includes a claim for equitable relief, including disgorgement of all profits earned by the defendants on sales in Massachusetts of Marlboro Lights. We are not aware of any Massachusetts decisions holding that plaintiffs in a successful class action G. L. c. 93A suit may, or may not, be awarded equitable monetary damages, and the issue has not been thoroughly briefed or argued. The plaintiffs' possible entitlement to such relief has no bearing on the issue of class certification, and it is premature to consider the matter at this stage of the litigation.

The plaintiffs also sought an injunction requiring the defendants to cease their deceptive practices and to conduct corrective advertising campaigns. Because a third amended complaint subsequently has been filed that eliminates those requests, and because the plaintiffs argue in their briefs only claims for actual, statutory, and monetary damages, we need not consider any prior claim for injunctive relief.

[6]The relevant portion of G. L. c. 93A, § 9, states:

"(2) Any persons entitled to bring [an action alleging an unfair or deceptive act under G. L. c. 93A, § 9 (1),] may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons; the court shall require that notice of such action be given to unnamed petitioners in the most effective practicable manner. Such action shall not be dismissed, settled or compromised without the approval of the court, and notice of any proposed dismissal, settlement or compromise shall be given to all members of the class of petitioners in such manner as the court directs."

years preceding the filing of the complaint.[7] The defendants filed a petition under G. L. c. 231, § 118, first par., with a single justice of the Appeals Court, seeking interlocutory review of the certification order. The single justice decertified the class and granted the plaintiffs leave to appeal from her decision to a panel of the Appeals Court. We granted the plaintiffs' application for direct appellate review. For reasons that follow, we now affirm the order of the Superior Court judge granting class certification. We shall first set forth, in some detail, the facts alleged, then deal with two procedural issues, and finally decide the certification issue.[8]

1. The plaintiffs' second amended complaint alleges the following facts. Since 1971, the descriptor "Lights" and the words "LOWERED TAR AND NICOTINE" have appeared on every pack of Marlboro Lights sold in Massachusetts. "Light" cigarettes are generally defined as cigarettes containing between

---

[7]The judge concurrently denied the plaintiffs' motion for class certification, pursuant to Mass. R. Civ. P. 23 (a), 365 Mass. 767 (1974), of a claim of unjust enrichment, on the ground that questions affecting only individual members would predominate over questions common to the class. The plaintiffs have not appealed from this portion of the judge's decision.

[8]The National Association of Manufacturers (NAM) filed a motion seeking leave to file an amicus brief in this case. The motion was accompanied by the brief. NAM subsequently revised that section of the brief labeled "Interest of Amicus Curiae" to reveal that three major tobacco companies (R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco USA, and Lorillard Tobacco Company) had made financial contributions to the preparation of the brief. In that updated filing, however, NAM did not disclose that the law firm that submitted its amicus brief is also the firm representing Philip Morris, Inc. (a party in this case), in a case addressing similar issues currently pending before the Supreme Court of Illinois. Rule 17 of the Massachusetts Rules of Appellate Procedure, as amended, 426 Mass. 1602 (1998), requires that a motion for leave to file an amicus brief "shall identify the interest of the applicant." A full and honest disclosure of the interest of amici is crucial to the fairness and integrity of the appellate process. Briefs of amicus curiae are intended to represent the views of *non*parties; they are not intended as vehicles for parties or their counsel to make additional arguments beyond those that fit within the page constraints of their briefs. Counsel for NAM had no basis to know that we now interpret Rule 17 to require this disclosure. For that reason, counsel cannot be faulted for not making the disclosure. NAM's amicus brief is accepted. Until such time as the rule or practice is modified by the court, counsel for proposed amici should make disclosure in the circumstances described.

We acknowledge the amicus brief filed by Washington Legal Foundation.

seven and fifteen milligrams of tar. The defendants have long known, however, that most smokers are likely to receive as much or more tar and nicotine from Marlboro Lights as they would receive from regular Marlboro (or other "full-flavored") cigarettes.[9] (Careful attention should be paid to the latter footnote, and to the footnotes that follow in Part 1 of this opinion, as they set forth documented materials and other facts that bear on the defendants' level of knowledge with respect to the alleged lower tar and nicotine quality of Marlboro Lights and the defendants' approach to marketing the cigarettes based on that information.) The defendants in fact purposefully have designed Marlboro Lights to produce Federal Trade Commission smoking machine test (FTC test)[10] results that enable, as a matter of Federal law, the defendants to promote their cigarettes to consumers as "lights" with "lower tar and nicotine." At the same time, the defendants took steps to ensure that Marlboro Lights would deliver to smokers amounts of tar and nicotine that are higher than those registered by the FTC test. The

---

[9]According to the plaintiffs' second amended complaint, a 1974 Philip Morris document, entitled "Some Unexpected Observations on Tar and Nicotine and Smoker Behavior," notes: "Generally, people smoke in such a way that they get more than predicted by machines. This is especially true for dilution cigarettes . . . . The [Federal Trade Commission (FTC)] standardized test should be retained: It gives low ratings."

In addition, a 1975 Philip Morris internal memorandum, entitled "Marlboro-Marlboro Lights Study Delivery Data," concluded:

> "The smoker data collected in this study are in agreement with results found in other project studies. The panelists smoked the cigarettes according to physical properties; i.e., the dilution and the lower RTD [*sic*] of Marlboro Lights caused the smokers to take larger puffs on that cigarette than on Marlboro 85's. The larger puffs, in turn, increased the delivery of the Marlboro Lights proportionally. In effect, the Marlboro 85 smokers in this study did not achieve any reduction in smoke intake by smoking a cigarette (Marlboro Lights) normally considered lower in delivery."

[10]According to the plaintiffs' second amended complaint, the FTC smoking test (which also goes by the name of the Cambridge Filter System test) purports to measure the amount of tar and nicotine in a cigarette with a machine that "mimics" human smoking behavior. The "inhaled" material is collected on a pad, extracted, and analyzed to arrive at the tar and nicotine yield levels of that particular cigarette.

defendants achieved this through a variety of design modifications, including, but not limited to, the strategic placement of microscopic ventilation holes in or around cigarette filters;[11] the modification of tobacco blend and weight, rod length and circumference;[12] the use of reconstituted tobacco sheets or expanded tobacco;[13] and the increase of smoke pH level[14] through the use of chemical additives and processes such as

[11]Exhibits submitted by the plaintiffs in support of their certification motion include a report documenting a study conducted by the Massachusetts Department of Public Health. The report indicates that many brands of light cigarettes are manufactured with ventilation holes in the filter that allow a smoker to draw in additional air when inhaling. In theory, the additional air reduces the relative levels of tar and nicotine "per volume of smoke that enters the body." The plaintiffs allege that the ventilation holes in Marlboro Lights are placed in an area often covered by a smoker's lips or fingers and thus are obstructed during normal use of the product. This problem is exacerbated with Marlboro Lights because the vent holes are virtually invisible to the naked eye and not marked (e.g., with a colored band or some other method). According to a study cited in a 1997 publication by the United States Centers for Disease Control and Prevention, blocking even some of the ventilation holes in light cigarettes dramatically increase a smoker's intake of tar and nicotine contained in cigarette smoke.

[12]The plaintiffs allege that the defendants have actively manipulated tobacco blend and weight, rod length and circumference, filters, tobacco processing, papers, and air dilution in order to maximize the amount of nicotine delivered to smokers. They cite to a 1971 Philip Morris internal report stating the following:

> "Tar reduction [in our study] was accomplished by means of an air dilution technique. This results in a reduction of tar delivery. However, it also results in a reduction of nicotine delivery. Therefore, when the tar delivery was reduced to get the medium tar delivery, it also reduced the nicotine delivery by a like amount. Thus, just to maintain the original nicotine delivery required that nicotine be added to that cigarette."

[13]According to the second amended complaint, reconstituted tobacco is an amalgamation of tobacco stalks, stems, floor sweepings, and dust. In the reconstitution process, these pieces of tobacco material undergo treatment that results in the extraction of some soluble components, including nicotine, and then are combined to form a sheet to which the defendants "directly apply nicotine extract in the exact amounts they desire."

[14]The plaintiffs allege in their second amended complaint that the defendants have manipulated the smoke pH in their light cigarettes in order to create more "free" nicotine and thereby enhance the actual nicotine delivery to smokers beyond that measured by the smoking machines.

ammoniation.[15] The defendants conducted their own internal tests to ensure that the actual amounts of tar and nicotine delivered under normal use remained at higher levels than those registered by the FTC test. By marketing their cigarettes as "Marlboro Lights," and branding them with the label "LOWERED TAR AND NICOTINE," the defendants intended to create an impression in the minds of customers that the cigarettes were "healthier" than regular cigarettes, thereby promoting the illusion of decreased tar and nicotine deliveries, in full awareness that Marlboro Lights would (as they were designed to) continue to deliver addictive levels of tar and nicotine. According to the plaintiffs, the defendants exploited their knowledge of the shortcomings of the FTC test method for measuring tar and nicotine levels in Marlboro Lights as part of their strategy to continue to increase sales and market shares, while concealing this information from the consumers. The plaintiffs characterize the defendants' conduct as a "campaign of deception and omission on Massachusetts consumers which persists to this day."[16]

[15]The plaintiffs allege that ammonia and other substances added by the defendants to tobacco used in Marlboro Lights create a more potent "kick." Some of these additives act to vaporize nicotine into a more potent "freebase" form that may evade detection by the FTC test.

[16]We take judicial notice of a comprehensive report of the Surgeon General of the United States, released on May 27, 2004, three years after the plaintiffs filed their second amended complaint and forty years after the 1964 publication of the first Surgeon General report assessing causality of smoking and disease. The new report, entitled "The Health Consequences of Smoking," prepared by the National Center for Chronic Disease Prevention and Health Promotion, is based on contributions and reported findings of studies by numerous experts and scientists, and has been extensively reviewed by authorities within the United States Department of Health and Human Services. The report presents persuasive evidence that smoking harms nearly every organ of the human body, causes many diseases and reduces the health of smokers in general. Of relevance to the plaintiffs' G. L. c. 93A claims is one of four major conclusions presented therein, that smoking so-called low-tar or low-nicotine cigarettes offers no clear health benefit over smoking regular or "full-flavored" cigarettes. Chapter 2 of the report reads, in relevant part:

"Since the first research reports linking smoking to lung cancer and other diseases, the tobacco industry has continually changed the characteristics of the cigarette. . . . These changes have included the addition of filter tips, perforation of the filter tips, use of reconstituted tobacco, and changes in the paper and in additives. During the nearly 50 years that these changes have been made in the United States, there

2. We next take up two procedural issues. The parties argue over the role of the single justice of the Appeals Court in considering the judge's order granting class certification. The plaintiffs contend that only a panel of the Appeals Court can rule on the merits of a class certification because an order by a single justice vacating class certification would (at least in a case like this) be tantamount to the single justice making a final determination of the case — a matter usually reserved to a panel. The defendants contend that a class certification order is simply an interlocutory order, like any other interlocutory order, that may be reviewed on its merits under G. L. c. 231, § 118, first par. The issue need not be decided. Both parties want the propriety of the certification order decided by an appellate panel. The single justice of the Appeals Court appropriately certified the correctness of her ruling to a panel of the Appeals Court, and, as noted, we granted direct appellate review. The matter, therefore, is properly before an appellate panel for disposition.

3. There is also disagreement between the parties over the order being reviewed — is it that of the motion judge or that of the single justice. The authority of the single justice on petitions arising under G. L. c. 231, § 118, first par., is "plenary, with the result that [the single justice's] order will be reviewed [by a panel] on appeal as if it were an identical order by the trial judge considering the matter in the first instance." *Jet-Line Servs., Inc.* v. *Selectmen of Stoughton*, 25 Mass. App. Ct. 645, 646 (1988). See *Manfrates* v. *Lawrence Plaza Ltd. Partnership*, 41 Mass. App. Ct. 409, 412 (1996); *Thorn Transit Sys. Int'l,*

have been substantial declines in the sales-weighted average tar and nicotine yields of cigarettes as measured by the [FTC test] protocol . . . . Limitations on this protocol for assessing actual yields to smokers have been widely acknowledged . . . . For example, tar and nicotine yields are lowered by perforation of the filter with small holes to increase dilution during machine smoking in the FTC protocol; unlike the machines, smokers tend to cover these holes with their fingers, thereby increasing the yield beyond that measured by the machine . . . . The changing cigarette was the focus of the 1981 report of the Surgeon General . . . ." (Citations omitted.)

Health Consequences of Smoking: A Report of the Surgeon General, Office of the Surgeon General, United States Department of Health & Human Services at 49 (May 27, 2004).

*Ltd.* v. *Massachusetts Bay Transp. Auth.*, 40 Mass. App. Ct. 650, 652 (1996); *Petricca Constr. Co.* v. *Commonwealth*, 37 Mass. App. Ct. 392, 395 (1994); *Demoulas* v. *Demoulas Super Mkts., Inc.*, 33 Mass. App. Ct. 939, 940 (1992). The essential legal question for the reviewing court will be "whether the single justice abused [her] discretion by entering an order without having a supportable basis for doing so." *Id.*, quoting *Highland Tap of Boston, Inc.* v. *Boston*, 26 Mass. App. Ct. 239, 240 (1988). Answering that question, however, requires examination of the trial judge's order. See *Boston Herald, Inc.* v. *Sharpe*, 432 Mass. 593, 602 (2000) ("While the focus of the petition should be on whether the single justice of the Appeals Court erred, the resolution of that inquiry might require [a reviewing court] to look indirectly at the underlying order of the judge in the trial court, to see whether there was an abuse of discretion or error of law when evaluating the competing interests and issuing the [relevant] order . . ."). The single justice is not a fact finder and must accept any relevant facts found by the judge when those facts have support in the record. Considerable deference is also required on the part of the single justice to determinations by the judge, especially where those determinations involve an exercise of discretion. "In most cases, based on the deference normally accorded determinations by the judge who heard the matter in the first instance, the single justice will decline to act on an application for relief under G. L. c. 231, § 118, first par., that does not disclose clear error of law or abuse of discretion." *Jet-Line Servs., Inc.* v. *Selectmen of Stoughton, supra.* As to a certification order like the one before us, where the judge in the Superior Court has (as we shall subsequently discuss) broad discretion in making a determination, we examine the single justice's decision to determine whether it is legally correct (including whether discretion has been abused), bearing in mind that the Superior Court judge's order should ordinarily not be overturned if it is factually supported and unaffected by clear error of law. The analysis of whether the single justice has abused her discretion, therefore, requires examination of the foundational order of the trial court and the merits of the case for certification presented to the judge. See generally *Planned Parenthood League of Mass., Inc.*

v. *Operation Rescue*, 406 Mass. 701, 706, 709 n.7 (1990). We now turn to those merits.

4. The standards governing certification of a G. L. c. 93A class action require findings that "the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated"; the putative class representation "adequately and fairly represents such other persons"; and the putative class representative brings "the action on behalf of himself and such other similarly injured and situated persons." G. L. c. 93A, § 9 (2). The statutory language differs in significant respects from that of Mass. R. Civ. P. 23, 365 Mass. 767 (1974). See *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33, 40 (1975). A class action may be maintained under rule 23 (a), only if findings are made that: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Rule 23 (b) further requires findings that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." A judge deciding a motion under rule 23 has broad discretion whether to grant class status. We have observed that "[t]he standard defies mathematical precision, and our cases reflect that fact." *Weld* v. *Glaxo Wellcome Inc.*, 434 Mass. 81, 85 (2001), and cases cited.

Although the requirements of rule 23 (a) provide a "useful framework for an analysis," we have cautioned a judge deciding a motion for class certification under G. L. c. 93A to avoid equating the similarity requirements of rule 23 (a) with requirements of § 9 (2) that the parties seeking certification are "similarly situated" and have suffered a "similar injury" as members of the class they seek to represent. *Fletcher* v. *Cape Cod Gas Co.*, 394 Mass. 595, 605 (1985). A judge possesses "a degree of discretion" in this matter, *id.*, but when the judge is deciding a certification request under § 9 (2), the judge must bear in mind " 'a pressing need for an effective private remedy'

for consumers, and that 'traditional technicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice.' " *Id.* at 605-606, quoting *Baldassari* v. *Public Fin. Trust, supra* at 40-41. Even under rule 23, a party moving for class certification need only provide "information sufficient to enable the motion judge to form a reasonable judgment" that certification requirements are met. *Weld* v. *Glaxo Wellcome Inc., supra* at 87, citing *Blackie* v. *Barrack*, 524 F.2d 891, 901 (9th Cir. 1975), cert. denied, 429 U.S. 816 (1976).

The judge certified a class consisting of purchasers of Marlboro Lights in Massachusetts during the four years preceding the filing of the complaint. His memorandum of decision reflects findings that the traditional criteria set forth in rule 23 (a) were satisfied and, further, that the asserted claim presented common questions of fact and law that make it appropriate for class certification. Implicit in the judge's decision was his finding that, if the plaintiffs' allegations proved true, all of the members of the certified class would have suffered a similar injury that would most effectively be redressed through a G. L. c. 93A consumer class action. In order to ensure that the prosecution of the case focused exclusively on the conduct of the defendants, and not on the smoking behavior of the class plaintiffs, the judge expressly restricted the plaintiffs' theories of actual damages to those "which do not rely upon individual proof."[17]

The judge's conclusion that the plaintiffs' claim warrants certification as a consumer class action is amply supported by the record. The claims of the plaintiffs and members of the purported class (estimated to number in the hundreds of thousands) derive from a common course of conduct on the part of the defendants and present the identical issue — whether the defendants misrepresented material information concerning the

---

[17]We interpret this statement to limit the plaintiffs' theory of damages to that which was argued in their memorandum in support of their motion for certification, and in their memorandum in reply to the defendants' memorandum in opposition to their motion, namely, the difference in market value between Marlboro Lights cigarettes that purchasers actually received and Marlboro Lights cigarettes as represented, and not, as somewhat awkwardly phrased in the judge's memorandum of decision, to the difference between what purchasers "paid for the Marlboro Lights cigarettes and what they would have paid if the defendants had not incurred the expense of false advertising."

design, function, marketing, toxicity, and tar and nicotine yields of Marlboro Lights and, in doing so, violated G. L. c. 93A, §§ 2 and 9. The plaintiffs are similarly situated to other consumers of Marlboro Lights, and, because the injury claimed is an economic, and not a personal, injury, all have been similarly injured. Were there to be individual trials (a highly unlikely scenario due to the lack of economic incentive), the common aspects of the defendants' conduct would become a predominant aspect of each trial. Considerations of delay, high costs, and arbitrary results provide further support for the appropriateness of class certification. We conclude that a class action is not only an appropriate method to resolve the plaintiffs' allegations, but, pragmatically, the only method whereby purchasers of Marlboro Lights in Massachusetts can seek redress for the alleged deception. See *Weld* v. *Glaxo Wellcome Inc., supra* at 93.

The heart of the defendants' position, and that adopted by the single justice of the Appeals Court, may be summarized as follows. In order to recover on a class action claim, the plaintiffs need to do more than merely establish that the defendants falsely advertised Marlboro Lights as "lowered tar and nicotine" and that the members of the class purchased the cigarettes. The defendants contend that a successful class action claim demands proof that the deceptive advertising caused each member of the class actual harm. Because, as conceded by the plaintiffs, some smokers of Marlboro Lights did in fact receive "lowered tar and nicotine," the plaintiffs have no chance of demonstrating that every class member was injured. The defendants further posit that whether or not the advertising was deceptive under G. L. c. 93A depends on whether or not a smoker reaped the benefits of a lowered tar and nicotine cigarette which, in turn, varied according to how each individual smoked the cigarette and even why the "light" cigarette was chosen by each smoker over a full-flavored cigarette. Thus, to some smokers, there was no reduced value and no deceptive advertising. The defendants contend that there can be no finding of deceptive advertising with respect to those members of the putative class who received lowered tar and nicotine because, in the words of the single justice, they "got what the advertising promised." Because these individualized issues of causation and injury go to the

core of the plaintiffs' G. L. c. 93A claim, the defendants maintained, and the single justice concluded, they would overwhelm any common issues with respect to the defendants' conduct. This reasoning and ultimate conclusion are incorrect.

We reject the proposition that the purchase of an intentionally falsely represented product cannot be, by itself, an ascertainable injury under our consumer protection statute. Whether conduct is deceptive is initially a question of fact, to be answered on an objective basis and not by the subjective measure argued by the defendants. See *Lowell Gas Co.* v. *Attorney Gen.*, 377 Mass. 37, 51 (1979); *Commonwealth* v. *AmCan Enters., Inc.*, 47 Mass. App. Ct. 330, 335 (1999). A successful G. L. c. 93A action based on deceptive acts or practices does not require proof that a plaintiff relied on the representation, see *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 703 (1975), or that the defendant intended to deceive the plaintiff, see *Swanson* v. *Bankers Life Co.*, 389 Mass. 345, 349 (1983), or even knowledge on the part of the defendant that the representation was false. See *Slaney* v. *Westwood Auto, Inc.*, *supra.* Although our cases offer no static definition of the term "deceptive," we have stated that a practice is "deceptive," for purposes of G. L. c. 93A, "if it 'could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.' " *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 777 (1980), quoting *Lowell Gas Co.* v. *Attorney Gen.*, *supra.* In the same vein, we have stated that conduct is deceptive if it possesses "a tendency to deceive." *Leardi* v. *Brown*, 394 Mass. 151, 156 (1985), quoting *Trans World Accounts, Inc.* v. *Federal Trade Comm'n*, 594 F.2d 212, 214 (9th Cir. 1979). "In determining whether an act or practice is deceptive, 'regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which [the act or practice] might reasonably be expected to have upon the general public.' " *Leardi* v. *Brown*, *supra*, quoting *P. Lorillard Co.* v. *Federal Trade Comm'n*, 186 F.2d 52, 58 (4th Cir. 1950).

Our cases, and those of the Appeals Court, also establish that advertising need not be totally false in order to be deemed deceptive in the context of G. L. c. 93A. See *Commonwealth* v. *AmCan Enters., Inc.*, *supra* at 336 ("the question is whether

[use of words 'yellow pages' and 'walking fingers'] in the context of the solicitation as a whole was misleading"). The criticized advertising may consist of a half truth, or even may be true as a literal matter, but still create an over-all misleading impression through failure to disclose material information. See *Urman* v. *South Boston Sav. Bank*, 424 Mass. 165, 168 (1997); *Underwood* v. *Risman*, 414 Mass. 96, 99-100 (1993); *Greenery Rehabilitation Group, Inc.* v. *Antaramian*, 36 Mass. App. Ct. 73, 78 (1994) ("One can violate § 2 of G. L. c. 93A . . . by failing to disclose to a buyer a fact that might have influenced the buyer to refrain from the purchase").

The Legislature, in G. L. c. 93A, § 2 (*b*), has mandated that Massachusetts courts, in construing which acts are deceptive, must be guided by interpretations of that term as found in the analogous Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45 (a) (1). Historically, the standard test for deception prohibited by the FTC Act was whether the act or practice had the capacity or tendency to deceive the general public, rather than whether it was relied on or resulted in actual deception. See, e.g., *Federal Trade Comm'n* v. *Colgate-Palmolive Co.*, 380 U.S. 374, 391-392 (1965); *American Home Prods. Corp.* v. *Federal Trade Comm'n*, 695 F.2d 681, 687 (3d Cir. 1982); *Exposition Press, Inc.* v. *Federal Trade Comm'n*, 295 F.2d 869, 872 (2d Cir. 1961), cert. denied, 370 U.S. 917 (1962). See also *Beneficial Corp.* v. *Federal Trade Comm'n*, 542 F.2d 611, 618 n.11 (3d Cir. 1976), cert. denied, 430 U.S. 983 (1977), quoting 1 Callman, Unfair Competition and Trademarks § 19.2 (a) (1) at 341-344 (1950) ("The general public has been defined as 'that vast multitude which includes the ignorant, [the] unthinking, and the credulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions' "). The FTC later clarified that test as follows: "if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (1984). This standard, more difficult to satisfy because it depends on the likely reaction of a reasonable consumer rather than an ignoramus, appears to have been ap-

plied by Federal courts ever since. See, e.g., *Federal Trade Comm'n* v. *Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994), cert. denied, 514 U.S. 1083 (1995); *Kraft, Inc.* v. *Federal Trade Comm'n*, 970 F.2d 311, 314 (7th Cir. 1992), cert. denied, 507 U.S. 909 (1993); *Southwest Sunsites, Inc.* v. *Federal Trade Comm'n*, 785 F.2d 1431, 1436 (9th Cir.), cert. denied, 479 U.S. 828 (1986). Although we need only be guided by, and not strictly adhere to, interpretations of the term "deceptive" under Federal law, what has been said in the above Federal cases comports in substance with what has been said in our own: an advertisement is deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product).[18]

If, as alleged, the defendants intentionally labeled their cigarettes "Lights" with "lowered tar and nicotine" in order to establish in the individual and collective consumer consciousness the concept that Marlboro Lights are more healthful (or, at least, less unhealthful) to smoke than regular cigarettes, and thereby increase the defendants' market share of cigarette sales,

---

[18]Interpretative regulations adopted by the Attorney General, pursuant to G. L. c. 93A, § 2 (c), also utilize the "capacity or tendency" to deceive standard throughout. Title 940 Code Mass. Regs. § 3.05(1) (1993) provides: "No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect." See also 940 Code Mass. Regs. § 3.04 (deceptive pricing) and § 3.10 (1993) (career schools); 940 Code Mass. Regs. § 3.09 (2003) (door-to-door sales).

With different language of similar effect, § 3.16(2) of the Attorney General's regulations provides that an act or practice is a violation of G. L. c. 93A, § 2, if "[a]ny person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction." 940 Code Mass. Regs. § 3.16(2) (1993). See also 940 Code Mass. Regs. § 6.01 (material representation is claim "which has the tendency or capacity to influence the decision of reasonable buyers or reasonable prospective buyers whether to purchase the product") and § 6.04(1) (1993) (misleading representation is material representation which seller knows or should know "is false or misleading or has the tendency or capacity to be misleading"). These regulations are authorized by G. L. c. 93A, § 2 (c), have the force of law, and "set standards the violations of which . . . constitute violations of [G. L.] c. 93A." *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 769-771 (1980).

with full knowledge that most Marlboro Lights smokers would not in fact receive the promised benefits of "lowered tar and nicotine," then there can be no question that the sales of Marlboro Lights occurred in circumstances that make the sales deceptive under G. L. c. 93A. No individual inquiries concerning each class member's smoking behavior are required to determine whether the defendants' conduct caused compensable injury to all the members of the class — consumers of Marlboro Lights were injured when they purchased a product that, when used as directed, exposed them to substantial and inherent health risks that were not (as a reasonable consumer likely could have been misled into believing) minimized by their choice of the defendants' "light" cigarettes.[19] The plaintiffs need not prove individual physical harm in order to recover for the defendants' deception. Nor need the plaintiffs show that each individual consumer relied on the defendants' false promise when purchasing Marlboro Lights. See *Nei* v. *Burley*, 388 Mass. 307, 313 (1983). Neither an individual's smoking habits nor his or her subjective motivation in purchasing Marlboro Lights bears on the issue whether the advertising was deceptive.

The plaintiffs' claims that most smokers would not get any

---

[19]The plaintiffs do not seek damages for personal injuries. Were it otherwise, unique and different experiences of each individual member of the class would require litigation of substantially separate issues and would defeat the commonality of interests in the certified class. The defendants argue that principles of claim preclusion may operate to harm the interests of future class members who may wish to assert personal injury claims in a future action. This argument has no merit. "Claim preclusion makes a valid, final judgment conclusive on the parties and their privies, and prevents relitigation of all matters that were or could have been adjudicated in the action." *O'Neill* v. *City Manager of Cambridge*, 428 Mass. 257, 259 (1998), quoting *Blanchette* v. *School Comm. of Westwood*, 427 Mass. 176, 179 n.3 (1998). It is true that neither G. L. c. 93A, § 9 (3), nor rule 23 allow a member of a certified class not wishing to be bound by the class litigation to "opt out." The doctrine of claim preclusion, however, only applies in circumstances where the party to be precluded has had the incentive and opportunity to raise the claim fully in the earlier lawsuit. See *id.*; *United States* v. *American Heart Research Found., Inc.*, 996 F.2d 7, 11 (1st Cir. 1993). The doctrine is grounded on considerations of fairness and judicial efficiency and would not operate to bar a member of a class certified to proceed, as here, only on an economic theory of damages from future pursuit of claims for personal injury unsuitable for class treatment. See *Gloucester Marine Rys.* v. *Charles Parisi, Inc.*, 36 Mass. App. Ct. 386, 391 (1994).

benefit by way of lowered tar and nicotine are pragmatically driven. So far as we are aware, the actual level of tar and nicotine received by an individual smoker is a factor that cannot be measured by any test.[20] In this regard, claiming, as the defendants do, that individual proof is necessary, or that benefits will vary widely between smokers, raises a specious issue that, if followed to conclusion, would eviscerate G. L. c. 93A as a remedy to abate this deceptive advertising.[21] Further, on the plaintiffs' theory of economic damages, which will be described next, the market price for Marlboro Lights was higher than it would have been had the cigarettes been honestly advertised and, therefore, *all* purchasers of the product paid more because of the deception.

What has been said above disposes of the class certification issue.[22] We take this opportunity to comment on the nature of damages under G. L. c. 93A. The plaintiffs allege that, as a

[20]Indeed, it may be unlikely that any individual would smoke a cigarette the exact same way twice. Thus, by implication, it is probable that no smoker received the promised benefit of lowered tar and nicotine every time he or she smoked a Marlboro Lights cigarette.

[21]The defendants' allegedly deceptive claims should be distinguished from other statements by manufacturers that their products deliver certain benefits (such as "helps to lower cholesterol") where most consumers actually receive the promised benefit, as may be ascertained by objective tests. If such a statement is untrue as to only a tiny percentage of consumers, a class action consisting of all purchasers would obviously not be appropriate. What we have in the present case, however, is the exact opposite: statements made by the defendants which are alleged to be untrue for the overwhelming majority of smokers, with only a very few smokers who fortuitously happened to smoke all their cigarettes in a manner that has resulted in the intake of lower tar and nicotine. Here, the members of the class who have not suffered the "injury" of higher tar and nicotine are both very few in number and impossible to identify. The device of a class action is (as has been mentioned) driven by pragmatic considerations. Requiring individual actions to be brought by thousands of individual smokers, merely to provide absolute certainty that (for example) each plaintiff sometimes covered up the vent holes, would be wholly impractical.

[22]The issue may be revisited. The "decision as to class certification is not immutable and if at any time it appears that for any reason [the representative plaintiff] no longer fairly and adequately protects the interests of the class, class status may be withdrawn or appropriately modified." *School Comm. of Brockton* v. *Massachusetts Comm'n Against Discrimination*, 423 Mass. 7, 14 n.12 (1996), paraphrasing in parenthetical *Social Servs. Union, Local 535* v. *County of Santa Clara*, 609 F.2d 944, 948-949 (9th Cir. 1979).

result of the defendants' deceptive advertising, all consumers of Marlboro Lights in Massachusetts paid more for the cigarettes than they would have otherwise paid. The plaintiffs expect to offer proof at trial that the amount that all purchasers of Marlboro Lights paid for the cigarettes exceeded their true market value (what purchasers would have paid had they known the truth). If they succeed in their proof, the plaintiffs argue that the correct model for measuring actual damages is the difference between the price paid by the consumers and the true market value of the "misrepresent[ed]" cigarettes they actually received. (Thus, the exact amount of actual damages may be determined by multiplying the number of cigarettes sold, in the years defined by the certification order, by the difference between the price paid and actual fair market value.) This is a variation on the traditional "benefit of the bargain" rule that awards a defrauded party the monetary difference between the actual value of the product at the time of purchase and what its value would have been if the representations had been true. See *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1, 8 (1982); *Rice* v. *Price*, 340 Mass. 502, 507 (1960). We agree that "the benefit of the bargain" damages, if proved with reasonable certainty, would be appropriate in this case. See *GTE Prods. Corp.* v. *Broadway Elec. Supply Co.*, 42 Mass. App. Ct. 293, 296 (1997); *Chamberlayne School & Chamberlayne Jr. College* v. *Banker*, 30 Mass. App. Ct. 346, 355 (1991).[23]

The defendants suggest that, regardless of whether or not the advertising of Marlboro Lights was unlawful under G. L. c. 93A, the plaintiffs are in no worse economic position than they would have been had they not chosen to smoke Marlboro Lights over regular Marlboro cigarettes. They point to the apparently uncontested fact that Marlboro Lights have always been priced exactly the same in Massachusetts as regular Marlboro

---

[23]We reject the defendants' repeated mischaracterization of the plaintiffs' theory of damages as a novel "fraud on the market" type theory, a theory we do not adopt today. Should the plaintiffs succeed in proving that the defendants' conduct in their marketing of Marlboro Lights constitutes deceptive practices prohibited by G. L. c. 93A, there is nothing novel or hypothetical about the plaintiffs' entitlement to damages that are measured by the difference between value paid and value received. As indicated above, whether the plaintiffs can establish proof of any difference at trial is another matter.

cigarettes. Logic, on the other hand, suggests that, all other things being equal, a truly low tar and nicotine cigarette would have economic worth greater than a comparable regular cigarette, due to the added value of an inherently "safer" cigarette. Whether plaintiffs ultimately will be successful in proving actual damages is a matter that need not be resolved at the certification stage.

In the event that the plaintiffs are unsuccessful in their attempt to prove actual damages, however, they will be entitled to recover statutory damages under G. L. c. 93A, § 9 (3) ("if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater"). As this court held in *Leardi* v *Brown*, 394 Mass. 151, 160 (1985), G. L. c. 93A "create[s] a legal right, the invasion of which, without more, constitutes an injury," and "under circumstances where there has been an invasion of a legally protected interest, but no harm for which actual damages can be awarded . . . the statute provides for the recovery of minimum damages in the amount of [twenty-five dollars]."

The defendants refer to a recent decision of the Appeals Court, *Lord* v. *Commercial Union Ins. Co.*, 60 Mass. App. Ct. 309 (2004), to support their contention that some monetary loss must be proved before even minimum damages of twenty-five dollars may be awarded. See *id.* at 321. What was said by the Appeals Court in the *Lord* decision does not help the defendants. There the defendant insurer was determined to have violated a legal obligation under G. L. c. 93A, § 2, by failing to give the plaintiff timely notice that his automobile coverage had been suspended for noncompliance with the inspection requirement. *Id.* at 317. The plaintiff had received prior notice that his policy would be canceled for nonpayment of premiums. The trial judge found, as did the jury, that the absence of timely notice was not the reason for the plaintiff's failure to have the vehicle inspected (there was evidence that the plaintiff already knew of the inspection requirement and had acknowledged it in writing), nor was it the reason for his subsequent losses incurred in an automobile accident. The judge nevertheless awarded the plaintiff statutory damages of twenty-five dollars, plus attorney's fees and costs. *Id.* at 317-318. The Appeals Court vacated the award based on

its conclusion that "the Legislature, in enacting and amending G. L. c. 93A, § 9, did not intend to confer on plaintiffs who have suffered no harm the right to receive a nominal damage award which will in turn entitle them to a sometimes significant attorney's fee recovery." *Id.* at 321-322. We agree with this observation. It states nothing more than what our own decisions have made perfectly clear — causation is a required element of a successful G. L. c. 93A claim. See, e.g., *Massachusetts Farm Bur. Fed'n, Inc.* v. *Blue Cross of Mass., Inc.*, 403 Mass. 722, 730 (1989) ("In the absence of a causal relationship between the alleged unfair acts and the claimed loss, there can be no recovery"); *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 850 (1983) ("plaintiff must show . . . a causal connection between the deception and the loss").

We do not agree, however, with language of the Appeals Court in the *Lord* decision ostensibly limiting the reach of our holding in *Leardi* v. *Brown, supra* at 159-161, to landlord-tenant actions. See *Lord* v. *Commercial Union Ins. Co., supra* at 323 ("To the extent that *Leardi* v. *Brown, [supra]*, may suggest otherwise, we believe that it was intended to be limited to the peculiar facts presented"). Our decision in *Leardi* emphasized that "G. L. c. 93A is a 'statute of broad impact,' which forms a 'comprehensive substantive and procedural business and consumer protection package.' " *Id.* at 159, quoting *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975). Significantly, the court construed the term "injury," in the context of G. L. c. 93A, to denote "an invasion of a legally protected interest." *Leardi* v. *Brown, supra* at 160. Construction of the term was deliberate, framed after careful consideration of the 1979 amendment to the statute, St. 1979, c. 406, § 1 (deleting require-ment of § 9 [1] that plaintiffs show some loss of "money or property, real or personal" and adding expansive language providing a right of action to "[a]ny person . . . who has been injured by another person's use or employment of any method, act or practice declared to be unlawful"); consultation of well-respected legal authorities and treatises construing the term "injury"; decisions by the Supreme Court of the United States; and consumer protection statutes in force in other jurisdictions, as well as State court decisions interpreting those statutes. See *id.* at 158-161.

The circumstances in the *Leardi* case, in which members of the plaintiff class challenged a landlord's efforts to mislead tenants by deceptive use of language in a lease, were essentially no different from the case before us. As fully explained above, the deceptive advertising, as alleged by the plaintiffs in this case, if proved, effected a per se injury on consumers who purchased the cigarettes represented to be lower in tar and nicotine. It follows that, if the violations of G. L. c. 93A alleged by the plaintiffs are proved, all members of the class of purchasers of Marlboro Lights in Massachusetts will have been injured (regardless of whether some smokers actually received lower tar and nicotine). This is so because all purchased (and, presumably, smoked) a product that was deceptively advertised, as a matter of law, because it was falsely labeled or, at least, created the over-all misleading impression that all smokers would receive "lowered tar and nicotine." Thus, all will be entitled to statutory damages, without regard to whether the plaintiffs are successful in establishing that consumers were overcharged for the deceptively advertised cigarettes. See *Ciardi* v. *F. Hoffmann-LaRoche, Ltd.*, 436 Mass. 53, 60 n.14 (2002). In citing to the *Lord* case, the defendants, once again, have confused issues of whether the plaintiffs will be able to prove actual damages with whether they have been injured by the defendants' allegedly unlawful conduct. Difficult issues with respect to determining the appropriate amount of actual or statutory damages to be awarded in a class action, or potential difficulties with the distribution of the aggregate damages award, do not preclude class certification when all other requirements are met. See *Weld* v. *Glaxo Wellcome Inc.*, 434 Mass. 81, 92 (2001).

5. We affirm the order of certification by the judge in the Superior Court of a class consisting of purchasers of Marlboro Lights cigarettes in Massachusetts during the four years preceding the filing of the plaintiffs' original complaint.[24]

*Order affirmed.*

[24]We decline to consider the plaintiffs' request, set forth in their brief, to extend the class definition adopted by the judge's certification order to include all purchasers of Marlboro Lights up until the date of final judgment. The matter is most appropriately raised before the judge in the Superior Court now that the judge has the guidance of this opinion.

CORDY, J. (dissenting, with whom Ireland and Cowin, JJ., join). This is a case about the propriety of a class certification decision. The issue is not, as the court puts it, "whether the marketing of Marlboro Lights as 'light' cigarettes that deliver 'lower tar and nicotine' *may be challenged* in a class action" under G. L. c. 93A, *ante* at 382; of course it may (emphasis added). The issue is whether *this class of plaintiffs* may bring that challenge. The proper focus in this case is, therefore, the constituency of the plaintiff class.

The plaintiff class certified by the motion judge consists of "purchasers of Marlboro Lights cigarettes in Massachusetts during the four years preceding the filing of [the plaintiffs' original] complaint." It is this description of the plaintiff class that must meet the requirements for certification under G. L. c. 93A. The procedure for these consumer class actions is governed by G. L. c. 93A, § 9 (2). That section provides in relevant part:

> "Any persons entitled to bring such action[1] may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons . . . ."

As the court states, *ante* at 391, and as the language of § 9 (2) itself makes clear, class certification depends on a showing that the defendants' deceptive practice caused "similar injury" to the members of the plaintiff class. G. L. c. 93A, § 9 (2). Accord *Fletcher* v. *Cape Cod Gas Co.*, 394 Mass. 595, 605 (1985) (plaintiffs must allege that they are "similarly situated" and have suffered "similar injury").

---

[1] "[S]uch action" refers to the action described in the previous paragraph, G. L. c. 93A, § 9 (1), which provides:

> "Any person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder . . . may bring an action . . . ."

The requirement that the plaintiffs demonstrate an "injury" may not be shrugged off lightly. Rather, as this court has consistently held, the injury requirement is a fundamental aspect of G. L. c. 93A for both individual plaintiffs and plaintiff classes. It is insufficient for a plaintiff to show merely that a trade practice is deceptive; rather, G. L. c. 93A "requires an injury before an award of even nominal damages is justified." *Leardi* v. *Brown*, 394 Mass. 151, 165 (1985).[2] The difficulty for the plaintiffs in this case is that some members of the plaintiff class, as the plaintiffs concede, actually *did* receive lower levels of tar and nicotine from Marlboro Lights. For simplicity, I will refer to the group of smokers who actually received lower levels of tar and nicotine as the "low-tar group," and those smokers who actually received equal or higher levels of tar and nicotine as the "high-tar group." In the words of the Appeals Court's single justice, the low-tar group "got what the advertising promised," and, as the court concludes, the members of the low-tar group "have not suffered the 'injury' of higher tar and nicotine."[3] *Ante* at 398 n.21. How, then, can a class meet the "similar injury" requirement when some of its members (the low-tar group) suffered no injury at all?

[2] This court and the Appeals Court have consistently made clear that a defendant's deceptive act must adversely affect the plaintiff before recovery under G. L. c. 93A, § 9, is permitted. See, e.g., *Gurnack* v. *John Hancock Mut. Life Ins. Co.*, 406 Mass. 748, 753 n.5 (1990), citing *Van Dyke* v. *St. Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 678 (1983) (denial of claim under insurance policy does not warrant liability unless plaintiff is harmed by that denial); *Lord* v. *Commercial Union Ins. Co.*, 60 Mass. App. Ct. 309, 321 (2004) ("G. L. c. 93A, § 9 [3], [requires] actual injury or loss before even minimum damages of $25 can be awarded"); *id.* at 321-322 ("the Legislature, in enacting and amending G. L. c. 93A, § 9, did not intend to confer on plaintiffs who have suffered no harm the right to receive a nominal damage award"); *Schwartz* v. *Travelers Indem Co.*, 50 Mass. App. Ct. 672, 676 n.5 (2001) ("Plaintiffs would not be allowed to recover on [a G. L. c. 93A, § 9,] action where they have suffered no harm at all; the case law indicates that some kind of harm is required before damages can be recovered"); *Abdella* v. *United States Fid. & Guar. Co.*, 47 Mass. App. Ct. 148, 153 (1999) (affirming dismissal "[b]ecause [plaintiff] was not injured by [defendant's] violation . . .").

[3] The court "reject[s] the proposition that the purchase of an intentionally falsely represented product cannot be, by itself, an ascertainable injury under our consumer protection statute." *Ante* at 394. I take the court to mean simply that purchase of a deceptively advertised product *may* in certain circumstances be alone sufficient to meet the injury requirement of G. L. c. 93A, § 9 (2), not

The court answers this question by pointing to the pragmatic considerations surrounding the class certification decision. Specifically, the court concludes that certification is appropriate in this case because "the members of the class who have not suffered the 'injury' of higher tar and nicotine are both very few in number and impossible to identify." *Ante* at n.21. I agree with the court that, in principle, class certification should not be impeded by the presence of a de minimis number of uninjured class members who are difficult to identify with specificity. Nevertheless, I do not think that, on the record in this case, it is possible to form a reasonable judgment that the low-tar group is made up of "only a very few smokers," who are "impossible to identify." *Ante* at n.21.

On a motion for class certification, the "plaintiffs bear the burden of providing information sufficient to enable the motion judge to form a reasonable judgment that the class meets the requirements [for certification]." *Weld* v. *Glaxo Wellcome Inc.*, 434 Mass. 81, 87 (2001). It is therefore the plaintiffs' burden to provide information sufficient to permit the reasonable conclusion that the class as a whole is "similarly injured," despite the presence of the uninjured members of the low-tar group; in other words, if the plaintiffs contend that the low-tar group is only a very few smokers, it is the plaintiffs' burden to provide information concerning the size of the low-tar group, and if the plaintiffs claim that members of the low-tar group are difficult to identify, it is their burden to provide information to that effect.

The plaintiffs presented no evidence before the motion judge concerning how many members of the proposed plaintiff class may have received lower levels of tar and nicotine. Rather, the plaintiffs' allegations and evidence focus almost exclusively on "the average smoker" (or, more generally, "the smoker") and cigarettes "smoked under normal use." The plaintiffs' exhibits do make a single passing reference to the percentage of smokers who block cigarette ventilation holes — an action that can

that the mere purchase of a deceptively advertised product *necessarily* constitutes per se injury.

increase the tar and nicotine yield of a cigarette[4] — but the study referenced, which concluded that only fifty-eight per cent of cigarettes showed signs of significant ventilation "hole-blocking,"[5] actually suggests that the low-tar group is fairly large (i.e., those smokers who smoked the other forty-two per cent of cigarettes). In sum, there was not sufficient information in the record to permit the motion judge reasonably to conclude that the low-tar group was so small that the class could meet the "similar injury" requirement.[6]

Likewise, it is not possible reasonably to conclude from the information submitted by the plaintiffs that the members of the low-tar group are "impossible to identify." The court may be correct to point out that no objective scientific test can measure how much tar and nicotine an individual smoker has ingested. See ante at 398. Nevertheless, the plaintiffs have plainly alleged that the increased levels of tar and nicotine ingested by class members were in large part the result of a number of behavioral factors, namely smokers' tendency to cover ventilation holes near the cigarette's filter and smokers' tendency to increase the frequency and volume of puffs to compensate for lower nicotine levels.[7] Plainly, smokers will be able to provide information

[4]Ventilation holes are designed to allow smokers to draw in extra air while smoking, thereby reducing the relative levels of tar and nicotine per inhalation. Marlboro Lights contain ventilation holes, but those holes are unmarked and are in the area of the cigarette filter that may be covered by the smoker's lips or fingers.

[5]The exhibit, entitled "Health Warning: Low Tar Cigarettes Are a Deliberate Con," references a 1988 study analyzing smoked cigarette butts. According to the exhibit, that study concluded that "58% of low tar cigarettes showed signs of significant hole-blocking."

[6]It is not surprising that the plaintiffs made no serious attempt to present evidence demonstrating that the low-tar group made up only a small portion of the certified class. The plaintiffs never argued the point because their theory of injury was that both groups were adversely affected not merely because they purchased a deceptively advertised product, but because the deceptive advertising inflated the market price of Marlboro Lights for all purchasers.

[7]Despite the conceded fact that at least some smokers did receive lower levels of tar and nicotine from Marlboro Lights, the court nonetheless speculates that "it is probable that no smoker received the promised benefit of lowered tar and nicotine," because "it may be unlikely that any individual would smoke a cigarette the exact same way twice." Ante at 398 n.20. This

concerning how they smoked Marlboro Lights cigarettes. It is therefore not impossible to identify smokers in the uninjured low-tar group and to exclude them from the class.[8]

In sum, the crux of my disagreement with the court concerns the sufficiency of the information presented by the plaintiffs in this case. Limited to the record before the motion judge, I do not think it is possible reasonably to conclude that the low-tar group is either so small as to be de minimis, or so unidentifiable as to permit class certification. By certifying a class that includes uninjured members, the motion judge effectively permitted precisely what we have criticized: a "purely 'vicarious suit[] by self-constituted private attorneys-general.' " *Leardi* v. *Brown*, 394 Mass. 151, 161 (1985), quoting *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33, 46 (1975).

I turn briefly to the court's treatment of the theory of injury actually pressed by the plaintiffs below, primarily to register a point of agreement with the court. The motion judge described the plaintiffs' theory as follows: "Plaintiffs may show a causal relationship between what they paid for Marlboro Lights cigarettes and what they would have paid if the defendants had

speculation runs in the face of an uncontested fact found on the record by both the motion judge and the single justice — namely, that whether a smoker received lower levels of tar and nicotine was dependent on the way that the smoker smokes. If the plaintiffs had intended to rest their certification motion on the argument that no one "smoke[s] a cigarette the exact same way twice," they would have made this argument below and provided "information sufficient" to permit the motion judge to make a finding on that issue. *Weld* v. *Glaxo Wellcome Inc.*, 434 Mass. 81, 87 (2001). They did neither.

[8]Importantly, the requirement that the plaintiffs present evidence concerning the manner in which individual class members smoke cigarettes would not necessarily preclude class certification under G. L. c. 93A, § 9 (2). While class certification under Mass. R. Civ. P. 23, 365 Mass. 767 (1974), requires compliance with both the prerequisites of rule 23 (a) — numerosity, commonality, typicality, and fairness and adequacy of representation — *and* the requirements of rule 23 (b) — predominance of common issues and superiority to other available methods of litigation — class certification under § 9 (2) does *not* require a showing of predominance of common issues or superiority to other available methods of litigation. *Weld* v. *Glaxo Wellcome Inc.*, *supra* at 86. *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33, 39-40 (1975). Because the plaintiff class in this case does not need to demonstrate the predominance of common issues of fact or law, the necessity of individual proof concerning smoking behavior would not foreclose certification.

not incurred the expense of false advertising."[9] The single justice restated the plaintiff's theory: "because of [Philip Morris's misrepresentations], cigarette purchasers were misled to a willingness to pay more for Marlboro Lights than would have been so, had the cigarette purchasers known [the truth]." Insofar as this theory purports to be a theory of *injury*, the theory is essentially a variant of the "fraud on the market" theory recognized in Federal securities cases,[10] under which the purchaser of a stock is entitled to the presumption that the purchase was made in reliance on all material information known to the market as a whole. See, e.g., *Basic, Inc.* v. *Levinson*, 485 U.S. 224, 242 (1988). The court explicitly states that its opinion in this case does not adopt a " 'fraud on the market' type theory," *ante* at n.23, and I agree that it would be imprudent to adopt the fraud on the market doctrine in a consumer products case, when no other State has done so,[11] and in the face of numerous critiques of the theory's validity.[12]

Nevertheless, because, like the Appeals Court's single justice,

---

[9]I do not understand the motion judge to mean merely that the advertising costs incurred by the defendants increased the cost of Marlboro Lights. While the amount of advertising undertaken by the defendants may have affected the price at which it was willing to sell Marlboro Lights, the expense of advertising (and, correspondingly, its effect on price) does not depend on whether the advertising was *misleading*. An honest advertisement is just as expensive as a dishonest one. Rather, as the single justice did, I understand the motion judge to mean that the plaintiffs may show relationship between the content of the deceptive advertising and the market-determined price of Marlboro Lights.

[10]The court notes, and I agree, that insofar as the plaintiffs' market-based theory relates only to proof of the amount of damages, *not* injury, the analogy to the "fraud on the market" theory of causation and injury is inapt. See *ante* at n.23.

[11]"Since the Supreme Court accepted fraud on the market in [*Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988)] . . . no [S]tate court with the authority to consider whether *Basic* is persuasive has chosen to apply it to claims arising under its own [S]tate's laws." *Kaufman* v. *i-Stat Corp.*, 165 N.J. 94, 113 (2000). Accord Recent Case, 114 Harv. L. Rev. 2550, 2550 (2001) ("no [S]tate appellate court has incorporated [the 'fraud on the market doctrine'] into the common law"). But see *Hurley* v. *Federal Deposit Ins. Corp.*, 719 F. Supp. 27, 34 n.4 (D. Mass. 1989) (speculating that "if the Supreme Judicial Court were faced with the question, it would recognize the fraud on the market theory as a substitute for pleading reliance where a company's stock is traded in an efficient market").

[12]When the Supreme Court of the United States first adopted the fraud on the market theory, it did so over lingering doubts about both the validity of

I would conclude that class certification in this case was improper where the plaintiffs failed to meet their "burden of providing information sufficient to enable the motion judge to form a reasonable judgment that the class meets the requirements [for certification]," *Weld* v. *Glaxo Wellcome Inc.*, 434 Mass. 81, 87 (2001), I respectfully dissent.

---

the economic theory itself and the ability of courts to understand, evaluate, and apply it. See *Basic Inc.* v. *Levinson*, 485 U.S. 224, 255-257 (1988) (White, J., concurring in part and dissenting in part) (outlining economic critique of fraud on the market theory); *id.* at 253 (White, J., concurring in part and dissenting in part) ("with no staff economists, no experts schooled in the 'efficient-capital-market hypothesis,' no ability to test the validity of empirical market studies, we are not well equipped to embrace novel constructions of a statute based on contemporary microeconomic theory"); *id.* at 253 n.4 (White, J., concurring in part and dissenting in part), quoting Gilson & Kraakman, The Mechanisms of Market Efficiency, 70 Va. L. Rev. 549, 549-550 (1984) ("legal culture's remarkably rapid and broad acceptance of an economic concept that did not exist twenty years ago is not matched by an equivalent degree of *understanding*" [emphasis in original]). In the sixteen years since the *Basic* case, doubts about the economic validity of the "fraud on the market" theory remain. See Bernard, Challenges to the Efficient Market Hypothesis: Limits to the Applicability of the Fraud-on-the-Market Theory, 73 Neb. L. Rev. 781, 782-783 (1994), quoting Jensen, Some Anomalous Evidence Regarding Market Efficiency, 6 J. Fin. Econ. 95 (1978) ("Since Basic, there has been an explosion of literature in financial economics casting doubt on the efficiency of at least some segments of the stock market. The theory once characterized in 1978 by Professor Michael Jensen as having 'more solid empirical evidence supporting it . . . [than any] other proposition in economics' has undergone so much questioning that leading researchers are now creating new theories to explain how, in equilibrium, market prices could reflect random factors that have nothing to do with firms' underlying fundamental values"). See also Ferrillo, The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases, 78 St. John's L. Rev. 81 (2004) (critiquing fraud-on-the-market theory); Gordon, Efficient Markets, Costly Information, and Securities Research, 60 N.Y.U. L. Rev. 761 (1985) (same).