Billings, A.J.
For the reasons that follow, the defendants’ Motion to Dismiss is ALLOWED. 
FACTS
A. Background: Haverty v. Commissioner of Correction
This is an action for damages filed in the wake of Haverty v. Commissioner of Correction, originally Suffolk Civil Action No. 95-3634. In Haverty, a class action, the plaintiffs sought injunctive relief against the practice of placing prisoners at MCI-Cedar Junction — generally, those thought to belong to “security threat groups” — in segregated confinement in the East Wing for non-disciplinary reasons, without complying with 103 C.M.R. §421.00, the regulations governing disciplinary placements in the former Departmental Segregation Unit (“DSU”). No damages were sought.
The Haverty plaintiffs were certified as a class and ultimately were successful, first on summary judgment in this Court and later on appeal, in obtaining equitable relief. See Haverty v. Commissioner of Correction, 437 Mass. 737 (2002) (“Haverty F). The SJC
affirm[ed] the grant of summary judgment on the plaintiffs’ due process claim to the extent that it applies to those prisoners who are (1) transferred to the East Wing from the West Wing; (2) labeled as gang members and placed in the Plymouth or other units of the East Wing; (3) returned to Cedar Junction; or (4) remain in the East Wing for longer than a brief period for “booking” or similar reasons. For these prisoners, the procedural protections set forth in 103 Code Mass. Regs. §§421.00 are required.
437 Mass, at 763-64.[1]
The order of remand left “the timing and manner of implementing the provisions of 103 Code Mass. Regs. §§421.00 at Cedar Junction” for determination in further proceedings in this Court. On January 17, 2003 this Court ordered that beginning April 30, 2003 no inmate may be confined to the East Wing for more than seven days without receiving a hearing in compliance with 103 C.M.R. §421.00; that inmates currently in the East Wing be transferred to the general population (i.e., out of the East Wing) unless first “determined to meet the standards for DSU confinement in accordance with the procedures set forth in the DSU regulations”; and that good time credits be awarded as an equitable, compensatory remedy to inmates unlawfully confined in the East Wing.
This last remedy failed to withstand a second round of appellate review. See Haverty v. Commissioner of Correction, 440 Mass. 1 (2003) (“Haverty IF) (reversing order pertaining to good time credits). After extensive administrative procedure which included individual hearings before an “East Wing Review Board” for 387 inmates, and further litigation as to the adequacy of those hearings, it appears that the equitable phase of the Haverty case is at, or approaching, an end. Left are numerous actions filed by individual inmates, of whom the plaintiff is one, who allege that they were confined in the East Wing according to procedures that Haverty I later ruled were unlawful and who seek damages for such confinement.
B. Allegations of the Complaint in This Action
The Second Amended Complaint alleges that the plaintiff Longval was, at all relevant times, a prisoner in custody of the Department of Correction. “Plaintiff is a member of the Haverty class, and, thus, the rulings of law are applicable to plaintiff.” Between 1993 and 1996 he spent various periods of time, totaling approximately 876 days, confined in the East Wing of MCI Cedar Junction, in the sort of restrictive conditions of confinement described in Haverty I. He was never afforded, and has never waived, a hearing under 103 CMR 421.00 in connection with any of his transfers to the East Wing. His confinements there were therefore unlawful under Haverty I and under Hoffer v. Fair, SJC No. 85-71 (decision of March 3, 1988), and Longval v. Commissioner of Correction, 404 Mass. 325, 328 (1989).
DISCUSSION
By their Motion to Dismiss, the defendants assert two infirmities in the Complaint:
1. First, they argue that because the Haverty class representatives sought only equitable relief, all members of the class are barred, by principles of res judicata (claim preclusion), from seeking damages in a separate action.
2. Second, they assert that the complaint fails to allege facts constituting a violation of the plaintiffs “clearly established” rights, and that they therefore are entitled to qualified immunity.
A. Claim Preclusion and Massachusetts Class Actions
The defendants’ res judicata defense rests on their assertion that although the Haverty class representatives did not seek damages on behalf of the class, they could have done so, and that the doctrine of claim preclusion — specifically, the rule against claim-split *310 ting — therefore precludes absentee class members from seeking damages in a separate action.
The principle the defendants assert is a familiar one, at least outside the context of class actions.
The doctrine of claim preclusion makes a valid, final judgment conclusive on the parties and their privies, and bars further litigation of all matters that were or should have been adjudicated in the action. This is so even though the claimant is prepared in a second action to present different evidence or legal theories to support his claim, or seeks different remedies. The doctrine is a ramification of the policy considerations that underlie the rule against splitting a cause of action, and is “based on the idea that the party to be precluded has had the incentive and opportunity to litigate the matter fully in the first lawsuit.” As such, it applies only where both actions were based on the same claim.
Heacock v. Heacock, 402 Mass. 21, 23-24 (1988); see Wright Machine Corp. v. Seaman-Andwell Corp., 364 Mass. 683, 689 (1974).
If the doctrine of claim preclusion is well settled in Massachusetts law, however, its application to class actions under Mass.R.Civ.P. 23 is not, owing perhaps to the relative rarity of class actions in our state practice. Had the question arisen under the cognate federal rule, the answer would be clear:
[T]he general rule is that a class action suit seeking only declaratory and injunctive relief does not bar subsequent individual damage claims by class members, even if based on the same events. In fact, “every federal court of appeals that has considered the question has held that a class action seeking only declaratory or injunctive relief does not bar subsequent individual suits for damages.”
Hiser v. Franklin, 94 F.3d 1287, 1291 (9th Cir. 1996), quoting In re Jackson Lockdown/MCO Cases, 568 F.Sup. 869, 892 (E.D. Mich. 1983), and citing Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867 (1984); Fortner v. Thomas, 983 F.2d 1024, 1030-32 (11th Cir. 1993) (“It is clear that a prisoner’s claim for monetary damages or other particularized relief is not barred if the class representative sought only declaratory and injunctive relief, even if the prisoner is a member of a pending class action”); and Wright, Miller, & Cooper, Federal Practice and Procedure: Jurisdiction §4455 (1981 and 1995 supp.) (“An individual who has suffered particular injury as a result of practices enjoined in a class action . . . should remain free to seek a damages remedy even though claim preclusion would defeat a second action had the first action been an individual suit for the same injunctive relief’).
The text of Massachusetts Rule 23 differs in significant respects from its federal counterpart. One of the more striking differences is the absence, in the Massachusetts rule, of any provision requiring notice to class members, or giving class members an opportunity to “opt out.” Contrast Fed.R.Civ.P. 23(c)(2) (providing for notice and opting-out in class actions certified under federal Rule 23(b)(3)). If anything, however, the differences between the two rules argue for a narrower, not a broader, application of claim preclusion principles in Massachusetts than in federal class actions. “(T]he standard for binding absentees by a class action judgment is simply fundamental fairness.” J. Smith & H. Zobel, Rules Practice, 7 Mass. Practice Series §23.2 at 94 (1975). The interests of fairness would be ill-served by a rule in which absentee class members, having been involuntarily yoked to a class action of which they received no notice and may have had no knowledge, were bound by the remedial elections of others.
The SJC recently considered an analogous situation in Aspinall v. Philip Morris Cos., 442 Mass. 381 (2004). In affirming the certification of a class action under Chapter 93A,[2] in which smoker/consumers sought benefit-of-the-bargain economic damages on account of alleged misrepresentations as to the virtues of “light” cigarettes, the court noted:
The plaintiffs do not seek damages for personal injuries. Were it otherwise, unique and different experiences of each individual member of the class would require litigation of substantially separate issues and would defeat the commonality of interests in the certified class. The defendants argue that principles of claim preclusion may operate to harm the interests of future class members who may wish to assert personal injury claims in a future action. This argument has no merit. “Claim preclusion makes a valid, final judgment conclusive on the parties and their privies, and prevents relitigation of all matters that were or could have been adjudicated in the action.” It is true that neither G.L.c. 93A, §9(3), nor rule 23 allow a member of a certified class not wishing to be bound by the class litigation to “opt out.” The doctrine of claim preclusion, however, only applies in circumstances where the party to be precluded has had the incentive and opportunity to raise the claim fully in the earlier lawsuit. The doctrine is grounded on considerations of fairness and judicial efficiency and would not operate to bar a member of a class certified to proceed, as here, only on an economic theory of damages from future pursuit of claims for personal injury unsuitable for class treatment.
442 Mass, at 399 n.19 (citations omitted).
As this discussion suggests, a rule that bound absentee class members to the representatives’ election not to seek damages, in addition to being fundamentally unfair to the absentees, would also have an unfortunate effect on the conduct of class actions themselves. In fact the Haverty case, even better than Aspinall, illustrates the point. There the representative plaintiffs, in advocating for certification of the class, argued that a class action was superior to other *311 available methods for the fair and efficient adjudication of the controversy (Rule 23(b)) in part because:
Plaintiffs seek only injunctive and declaratory relief and thus “the administrative difficulties involved in determining and distributing money damages to numerous absentee class members do not exist.”
Memorandum in Support of Plaintiffs’ Motion for Class Certification, paper # 13 in the Haverty Superior Court file at 7, quoting Smith and Zobel, §23.9 at 102 n.55.
The representative plaintiffs’ litigation judgment not to seek damages in the class action made undoubted good sense, provided they themselves, having made the election, were willing to forego their own monetary claims. That the controversy could thus be adjudicated on a global basis, by addressing the legality of a particular practice with broad application without the necessity of holding individualized eviden-tiary hearings on damages, was surely a significant factor in the Court’s determination that Rule 23 offered a superior method of resolving the dispute.
Just as surely, a rule that the class representatives’ election to seek only equitable relief should preclude later damages claims by absentees would be highly discouraging of the equity-only class action: plaintiffs and their counsel would be hesitant, out of concern for the rights of absentees and for counsel’s own malpractice exposure,[3] from making the election to forego damages claims on behalf of the class. Judges would be correspondingly less willing to certify class actions whose advantages, because numerous individual damage claims must be heard and adjudicated in the class action or else foregone, would be much less apparent than they were in Haverty.
This could not be what the drafters of Rule 23 intended. Concern for the practical workability of class actions, no less than for fundamental fairness to absentees, dictates that the defendants’ claim preclusion defense must be rejected.
B. Qualified Immunity
The defendants’ qualified immunity defense, however, stands on a different footing. The basic contours of the defense, as a matter of both Massachusetts and federal law, are well settled.
The doctrine of qualified immunity shields government officials from liability for civil damages “insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” For a right to qualify as “clearly established,” the unlawfulness of the defendant’s conduct “must be apparent” based on then-existing law.
Shedlock v. Department of Correction, 442 Mass. 844, 859 (2004), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), and Anderson v. Creighton, 483 U.S. 635, 640 (1987), and citing Siegert v. Gilley, 500 U.S. 226, 232 (1991) (right must be clearly established “at the time the defendant acted” to overcome defense of qualified immunity).
The standard is purely an objective one.
In Harlow v. Fitzgerald, supra, the Supreme Court removed the subjective aspect, i.e., the actor’s intent, from the qualified immunity standard it had articulated in Wood v. Strickland, 420 U.S. 308,322 (1975). The “driving force” behind this reformulation of the doctrine was the Court’s desire “that ‘insubstantial claims’ against government officials be resolved prior to discovery and on summary judgment if possible.” In short, “[immunity ordinarily should be decided by the court long before trial.”
Clancy v. McCabe, 441 Mass. 311, 322-23 (2004) (citations omitted), quoting Anderson, 483 U.S. at 640 n.2; Harlow, 457 U.S. at 818-19; and Hunter v. Bryant, 502 U.S. 224, 228 (1991). Moreover, “(i]f it is evident from the allegations of the complaint alone that the defendant is entitled to qualified immunity, the matter may be decided by means of a motion to dismiss.” Guttierrez v. Massachusetts Bay Transportation Authority, 437 Mass. 396, 404 (2002).
In this case, the qualified immunity defense fails if the right vindicated in Haverty I was “clearly established” at the time of the events giving rise to the plaintiffs claim, i.e., before the Haverty plaintiffs prevailed in this Court and, ultimately, in the SJC. Haverty I was a 4-3 decision. The importance and the complexity of the issues presented are both suggested at the outset of the majority’s opinion:
This appeal presents, in yet another form, the chronic controversy generated by the tension between efforts by the Commissioner of Correction... to manage our prison system, and claims by prisoners for protection from alleged violations of their constitutional and statutory rights. This clash also arises, as here, in efforts to reconcile the interests served by punishment: deterrence, isolation and incapacitation, retribution and moral reinforcement, and reformation.
Haverty 1,437 Mass, at 738. Nonetheless, the majority characterized the issue in straightforward fashion, as being one of
whether the defendants . . . can ignore regulations, duly enacted and still in effect, which govern the placement of prisoners in segregated confinement for nondisciplinaiy reasons.

Id.

The dissenters, of course, saw the issue differently:
The court holds that the procedural protections governing the removal of an inmate from the general prison population and his confinement to a department segregation unit (DSU) apply to decisions regarding the housing of two-thirds of all of the prisoners in the State’s only maximum security *312 prison, Massachusetts Correctional Institution, at Cedar Junction . . . These protections are contained in the department’s regulations at 103 Code Mass. Regs. §421.00 (1993)... Their application to the housing of the majority of prisoners at Cedar Junction is contrary to their purpose and the judicial and regulatory history leading to their enactment ... In my view, decisions regarding the assignment of prisoners to housing within the general population of a prison are beyond the reach of the DSU regulations and not properly subject to a due process challenge in these cases.
Id., 437 Mass, at 764-65 (Cordy, J., dissenting, joined by Cowin and Sosman, JJ.).
The Justices’ disagreement arose from the origin of the regulations at issue, as well as the nature of the actions challenged by the Haverty plaintiffs. In 1988 a single justice of the SJC (Liacos, J.), considered a due process challenge to the Department’s method of assigning inmates to its Departmental Segregation Units,[4] or DSU. Hoffer v. Fair, No. SJ-85-0071 (March 3, 1988). The Commissioner had made the assignments based on the recommendations of institutional disciplinary boards, made after a finding that the inmate had committed one or more specific punishable offenses. Hoffer at 4. The Single Justice identified various due process flaws in the procedure, and ultimately, “ordered that changes be made to the then-existing version of the DSU regulations.” Haverty I, 437 Mass, at 744.
This was done, and the new regulations were codified at 103 CMR §421.00. They are still in effect, and require the observance of carefully spelled out procedures[5] before any inmate may be assigned to the DSU, whether for disciplinary reasons or simply “because his continued presence in a general institution population would be detrimental to the program of the institution” because he might injure others, damage property, or otherwise interrupt the safe operation of the institution. 103 Code Mass. Regs. §421.01; Haverty I, 437 Mass, at 744-45.
In 1995, following a “lockdown” at Cedar Junction, the Commissioner formally closed the DSU, reorganized the institution in certain respects (see below), and began administrative proceedings to repeal 103 CMR §421.00. The repeal was prevented, however, by an injunction issued by the single justice in response to a motion by the plaintiffs in the Hoffer case. Id., 437 Mass, at 745. The Commissioner did not appeal the injunction to the full court, and the DSU regulation was not repealed.
The Commissioner’s organizational changes, however, remained in effect. These included the abolishment of the DSU, and the division of housing units into two “phases” known as the “East Wing” and the “West Wing.” Conditions of confinement in the East Wing were significantly more restrictive than those in the West Wing and, in the majority’s view, were “in substantial measure identical to those in the [former] DSU.”[6] Id., 437 Mass, at 757.
Inmates were assigned to the East Wing in one of two ways. All inmates arriving at Cedar Junction, whether because they were initially classified to a maximum security institution or because they failed in a lower security facility, were housed in the East Wing initially. The East Wing also received inmates by transfer from the West Wing. Transfers were effected solely at the discretion of the superintendent or his designee, based on factors that included the inmate’s
disciplinary history, over-all adjustment, and “enemy” issues — i.e., concerns that prisoners housed in the same block might not get along well . . . [T]he transfer of a prisoner from the West Wing to the East Wing is for reasons “usually surrounding disciplinary reports,” although it is undisputed that the transfer to the East Wing is not imposed for the commission of a disciplinary offense. A prisoner transferred from the West Wing to the East Wing receives no notice or hearing incident to the transfer.
437Mass. at 746. In the Haverty /majority’s view, East Wing conditions were sufficiently “DSU-like” that, even though they were not imposed as punishment, a transfer there required compliance with the procedural protections afforded by the DSU regulation.
The dissent, by contrast, viewed the issue as one of institutional administration to which the DSU regulations had, by their express terms, no application. The dissenters accepted the premise that East Wing conditions were materially more restrictive than those in the West Wing, but found “overwhelming support in the record for the conclusion that the [1995] reconfiguration was necessary to secure the safety of prisoners and staff alike, in the context of an unprecedented influx of violent gang members.” 437 Mass, at 765. “By 1995, the use of the DSU as a tool to control violence within Cedar Junction’s highly volatile population by isolating a few troublemakers (it housed only two inmates) from the general population was patently ineffective, and its use was eliminated.” Id. at 768-69.
In rejecting the notion that the reorganization constituted a pretextual end-run around the DSU regulations, the dissenters found substantial record evidence that it was motivated by legitimate security concerns, resulting from “the changing racial composition of the prisoner population, the sharp increase in individuals labeled as gang members, and the accompanying increase in violence in the prison system.” They characterized the dispute between the parties’ experts as denoting “a difference of opinion as to the appropriate response of prison officials to the problem of incarcerating young, violent gang members.” Id. at 773.
The dissenters found the DSU regulations facially inapplicable because they “apply only to the removal *313 of prisoners from the ‘general population’ and their placement in conditions of confinement involving a significant reduction of liberty from that afforded the ‘general population.’ ” Id. at 769. Because two-thirds (418 out of 634) of the cells at Cedar Junction were located in the East Wing, they reasoned, it made no sense to label a transfer from the West Wing to the East Wing a removal from the “general population,” which in normal usage “is simply where the majority of prisoners normally lives, absent confinement in a specialized unit within the prison.” Id. at 770 & nn. 9 & 10, citing 103 CMR §§423.06 (defining “general population” as “any housing area other than a special management unit, health service unit, departmental segregation unit, departmental disciplinary unit, or the departmental protective custody unit”), and 421.06 and 421.09 (defining a DSU as an area designated “for any inmate segregated” from the “general population”).
The dissent concluded:
The DSU regulations plainly do not apply to changes in the general conditions of confinement at any prison in the Commonwealth, or to the mere presence of severely restrictive conditions. They have no relevance to decisions about where (i.e., in which general population area) a prisoner will be housed, or to decisions to increase security requirements within different levels of confinement. They were promulgated to afford due process rights for those prisoners singled out for isolation from the general population in conditions significantly more restrictive than those experienced by that general population. The record does not support a finding on summary judgment that this is occurring at Cedar Junction. The DSU regulations apply to the current operation of Cedar Junction, if at all, only if prisoners were selected for further segregation from the maximum wing or the minimum wing populations, under conditions significantly more restrictive than those present in either.
Id. at 775-76.
Haverty I followed on the heels of Hoffer and of several reported decisions, rendered before the facts giving rise to this case and discussing the applicability of the DSU regulations to situations other than a frank reclassification to the DSU. In Royce v. Commissioner of Correction, 390 Mass. 425 (1983), the SJC reversed the Superior Court’s dismissal, on a Rule 12(b)(6) motion, of a complaint alleging that the plaintiff inmate had spent over two years in the MCI-Walpole DSU and was still awaiting his classification hearing. The SJC concluded from the allegations of the pro se complaint that Royce was in “awaiting action” status pursuant to 103 CMR §§421.06(1) and 430.19(1). Noting that such status was by definition temporary, the court held that it could not lawfully be used “as a means to accomplish an unlimited punishment immune to the procedures set forth in the rules and regulations.” 390 Mass, at 429-30, citing Hewitt v. Helms, 459 U.S. 460, 477 n.9 (1983) (“Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates”).
In Longval v. Commissioner of Correction, 404 Mass. 325 (1983), the plaintiff — the same plaintiff as in this case, in fact — was granted partial summary judgment on liability on his claims arising from two separate transfers from the general population at MCI-Walpole to the Administrative Segregation Unit (“ASU”) at MCI-Concord. Both transfers were the result of Longval’s having received disciplinary reports. Neither was preceded by a hearing. In reversing the grant of partial summary judgment for the plaintiff, the SJC held that there was a genuine issue of material fact as to whether or not the Concord ASU was the “substantial equivalent” of the Walpole DSU, such that the DSU regulations should have been followed. “Certainly,” the SJC said, “the department and the commissioner may not sidestep statutory and regulatory provisions stating the rights of an inmate as to his placement in a D.S.U. by assigning as a pretext another name to such a unit.” 404 Mass, at 328-29 (citing Royce).
Neither Royce nor Longval, however, addressed the issues which divided the majority and the dissent in Haverty I: whether or not the placement of a majority of Cedar Junction inmates in the East Wing as part of the 1995 reorganization were in fact removals from the general population, so as to bring the DSU regulations into play, or else amounted to a pretextual sidestepping of those regulations. That three justices of the SJC could still be of the opinion, after full briefing, argument, and due deliberation, that the placements were lawful may not be absolutely dispositive of the qualified immunity issue, but it is at least some indication that the matter was not so clearly settled that the unlawfulness of the practice would have been apparent to a reasonable corrections official, based on then-existing law. See Shedlock, 442 Mass, at 859, quoting Anderson, 483 U.S. at 640. It is at least clear that neither Hoffer, Royce, Longval, nor any other pre-1995 case called to the Court’s attention addressed, or disposed of, the precise issue that Haverty I resolved.
It is also worth noting that several decisions by judges of this Court and of the Appeals Court, prior to Haverty I, may well have encouraged the belief on the part of corrections officials that the 1995 reorganization did not offend the DOC regulations or the constitution. See, among the reported cases and in chronological order of the Superior Court decisions:
Gilchrist v. Commissioner of Correction, supra (in which the plaintiff was, following a 1993 precursor to the 1995 reorganization (described in Haverty I, 437 Mass, at 766 (Cordy, J., dissenting)), transferred to the East Wing’s “Phase III” unit without a *314 hearing; a Superior Court judge in May 1994 allowed defendants’ motion for summary judgment; the plaintiff appealed; the case was remanded on the parties’ joint motion for further proceedings in light of Sandin v. Conner, 515 U.S. 472 (1995), which changed the analysis for determining whether a prisoner claiming denial of procedural due process has a protected liberty interest; a second Superior Court judge in November 1995 granted summary judgment for the defendants on qualified immunity issue and for the plaintiff on his claim for injunctive relief; and the Appeals Court reversed in 1999, discerning a genuine issue of material fact as to whether East Wing was the “substantial equivalent’’ of the DSU, such that 103 CMR §421.00 applied).
Johnson v. Dubois, 1996 WL 1185052 (Mass.Super. 1996; Grasso, J.) (holding that inmates’ confinement to Cedar Junction’s West Wing Segregation Unit pending outcome of their disciplinary hearings did not offend due process clause, because “[i]n applying Sandin, courts have consistently found that disciplinary segregation and subsequent changes in conditions of confinement have not reached the level of ‘atypical, significant deprivations,’ ” and that 103 CMR §421.00 did not apply because the WWSU was not the functional equivalent of the DSU, and “the Commissioner of Corrections has broad discretion to transfer inmates confined within the Massachusetts correctional system”).
Tibbs v. Duval, 1998 WL 1284199 (Mass.Super. 1998; Borenstein, J.) (finding no violation of the due process clause or of 103 CMR §421.00 in inmate’s transfer, following a fight and without a hearing, from Cedar Junction’s general population to the East Wing’s more restrictive Orientation Unit);[7] and
Dahl v. Commissioner of Correction, 61 Mass.App.Ct. 1118 (2004) (Rule 1:28 decision) (noting that a judge of the Superior Court had (in September 2000) granted summary judgment to the defendants, upholding their actions in placing the plaintiff in the East Wing without following the DSU regulations).
Finally, I note that in the Dahl decision, supra, the Appeals Court, while holding that the judgment should be amended to include a declaration that the plaintiffs confinement in the East Wing was invalid absent compliance with 103 CMR §421.00, affirmed the dismissal of his claim for damages. The court took note of the vigorous dissent in Haverty I, and concluded from this that prior to that decision, “there could not have been a clearly established right.” Dahl at n.9. While the decision, being under Rule 1:28, may lack precedential value, see Lyons v. Labor Relations Comm’n, 19 Mass.App.Ct. 562, 566 (1985), its reasoning is sound. Where the judges of the Commonwealth have not spoken with one voice — or anything approaching it — on an issue, it is difficult to discern, in the Haverty I majority’s final pronouncement, a “clearly established statutory or constitutional right[ ] of which a reasonable person would have known,” Harlow, 457 U.S. at 818, such that a governmental official should be held answerable in damages for incorrect prognostication.
ORDER
For the foregoing reasons, the defendants’ Motion to Dismiss is ALLOWED. Judgment shall enter, dismissing the Complaint.

The court went on to “vacate so much of the order as may apply to prisoners sent to the East Wing of Cedar Junction initially on confinement in the expectation that their stay there will be brief,” reasoning that such a brief placement “implicates a lesser deprivation of individual liberty than it does for the prisoners whose confinement to the East Wing is lengthy or indefinite.” 437 Mass, at 764, 763.

The fact that Aspinall was a Chapter 93A, not a Rule 23, class action had implications for the propriety of class certification, see 442 Mass, at 391-92. There is no reason to suppose, however, that the claim preclusion rules should differ as between the two types of class actions.

I take judicial notice that attorneys at Massachusetts Correctional Legal Services, which represented the class plaintiffs in Haverty, have been sued for legal malpractice by numerous inmates on the ground that they should have asserted claims, in the class action, for damages. Presumably, much will depend in these cases on whether absentee members of the Haverty class were, or were not, precluded from seeking damages in their own separate actions. Cf. Miller v. Mooney, 431 Mass. 57, 60-61 (2000) (discussing the role of detrimental reliance in attorney’s malpractice liability to persons with whom he has no express agreement to provide legal services).

These consisted of 30 cells in the East Wing at Cedar Junction, 30 more in the West Wing, and 30 more at MCI Norfolk. Hoffer at 4. By 1995, however, the DSU was in a state of virtual desuetude, housing only two inmates at Cedar Junction. Haverty I, 437 Mass, at 768 (Cordy, J., dissenting).

The regulations address such familiar due process themes as notice, the evidentiary hearing, the right to counsel, confrontation of witnesses, etc., as adapted to the correctional setting.

The aspect of East Wing conditions that most troubled the Haverty I majority was “the segregation of a prisoner in near solitary confinement, for no specified period,” a circumstance termed, by the plaintiffs’ expert psychiatrist, “highly toxic to psychological functioning.” 437 Mass, at 752, 756.

In Haverty, Judge Grabau entered separate and final judgment in the plaintiffs’ favor to facilitate a prompt appeal, in part because “I have been informed that the due process issues in this case are similar to the due process issues raised in another case heard in the Superior Court, where the judge made a decision contrary to my decision in this case,” referencing the Tibbs decision. Order on the Defendants’ Motion Pursuant to MRCP, Rule 54(b) for Separate and Final Judgment (3/9/00).